UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| THOMAS A. BATH, d/b/a<br>INFINIA BUILDERS LLC | : | |
| Debtor | : | Bankruptcy No. 09-14724 |

| | | |
|---|---|---|
| MONARCH CAPITAL CORP. | : | |
| Plaintiff | : | |
| v. | : | |
| THOMAS A. BATH, d/b/a<br>INFINIA BUILDERS LLC | : | |
| | | Adversary No. 09-0304 |
| Defendant | : | |

..................................................

MEMORANDUM

..................................................

Presently before me is the motion filed by plaintiff Monarch Capital Corp. for partial summary judgment against the debtor/defendant Thomas A. Bath.

Monarch filed a three count complaint against the debtor. In Count I, Monarch asserts that it holds a nondischargeable debt against the debtor pursuant to 11 U.S.C. § 523(a)(2). In Count II, it seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(6). And in Count III, Monarch objects to the debtor's chapter 7 discharge under 11 U.S.C. § 727(a)(2), (a)(4), and/or (a)(7).

After the debtor filed a timely answer in opposition to all three counts, Monarch filed a motion for summary judgment as to Count I only. The debtor then filed an answer opposing such relief.

Upon consideration of the oral arguments of counsel, as well as the memoranda, declarations and exhibits filed in support of their respective positions, I conclude, for the following reasons, that Monarch's motion for summary judgment as to Count I must be granted.

I.

The following material facts (with one exception noted below) are not in dispute.

Monarch is a New Jersey corporation with offices located in West Caldwell, New Jersey. Complaint and Answer, ¶ 4. Infinia Builders, LLC is a limited liability company located in Norristown, Pennsylvania. Debtor Thomas Bath is the president and sole owner or member of Infinia. Complaint and Answer, ¶¶ 5-6.[1] Infinia occasionally would hire employees. Otherwise, the sole employee was Mr. Bath. Debtor's Answer in Opposition to Summary Judgment, ex. B (Bath Deposition, at 9). Infinia is no longer doing business. Id., Bath Deposition, at 37.

Charles Alario is the "principal" of CPA of New Jersey, Inc., as well as another entity known as Buffets of New Jersey, Inc. Bath Declaration, ¶ 2. Mr. Alario, on behalf of CPA, engaged Infinia to construct a Golden Corral restaurant in Howell,

---

[1]Although the complaint and answer both assert that Infinia was a limited liability company, the deposition of Mr. Bath makes that issue less clear. He too described Infinia as an LLC. Debtor's Answer in Opposition to Summary Judgment, ex. B (Bath Deposition, at 8). But when asked his position with Infinia he replied: "I was president and sole owner. Sole proprietorship." Id., Bath Deposition, at 9. For summary judgment purposes, I shall accept that Infinia is a limited liability company.

New Jersey. Bath Declaration, ¶ 1. In connection with the construction of this restaurant,

Infinia was to obtain and install all necessary restaurant equipment. Bath Declaration, ¶

3; Bath Deposition, at 31.

On or about September 13, 2007, Infinia prepared and sent to Mr. Alario a

nine-page invoice, signed by Mr. Bath, itemizing in detail each and every item of

equipment that was to be purchased and installed in the Howell restaurant. Motion, ex.

A. The invoice, with installation costs included, totaled $804,126. Id. On October 10,

2007, Infinia prepared a revised invoice. Id. This revised invoice, signed by Mr. Bath,

stated:

| | |
|---|---|
| Total Amount of Order: | $804,126.00 |
| Amount received from owner | $204,126.00 |
| Net Balance | $600,000.00 |
| Deposit | $300,000.00 |
| upon delivery | $150,000.00 |
| upon installation | $150,000.00 |
| Total Net Balance | $600,000.00 |

Motion, ex. A.

Monarch, which lends money for the purchase and leasing of equipment,

James Jenco Declaration, ¶ 2, entered into a purchase money security agreement with

CPA which was signed by CPA on October 3, 2007 and accepted by Monarch on October

11, 2007. Complaint and Answer, ¶ 7; Jenco Declaration, ¶ 4; Motion, ex. B. The

collateral is described as "[v]arious restaurant and food service equipment . . ." located at

Golden Corral in Howell, New Jersey.

In connection with this agreement, Monarch agreed to lend to CPA the sum

of $600,000 in order for CPA to purchase equipment to be installed in a Golden Corral

restaurant owned by CPA and located in Howell, New Jersey. Jenco Declaration, ¶ 4. In

the security agreement, CPA consented to be sued in New Jersey. Motion, ex. B, ¶ 15.

Also on October 11, 2007, Infinia sent by facsimile transmission a letter on

CPA letterhead. Motion, ex. C; Bath Deposition, at 54.[2] This transmission was addressed

to and sent to Monarch, was signed by Mr. Alario and was "agreed to" by Mr. Bath as

president of Infinia. Id. This letter stated in full:

> Monarch Capital Corporation
> 1120 Bloomfield Avenue
> West Caldwall, NJ 07006
>
> Gentlemen:
>
> Contemporaneously herewith, we are furnishing to you an
> Acceptance Certificate dated _____, 2007 for all of the
> equipment (the "Equipment") covered by the Purchase Money
> Security Agreement No. 094500 dated October 3, 2007 (the
> "Security Agreement"), between you as Secured Party and us
> as Debtor.  Although said Acceptance Certificate covers all of
> the Equipment, having a total original cost of $804,126.00,
> the Equipment has not in fact all been delivered and/or
> installed.  To date, we have provided a deposit on Equipment
> in the amount of $204,126.00 to Infinia Builders, LLC, 1920
> West Marshall Street, Bldg. 1, West Norriton, Pennsylvania
> 19403 (the "Vendor/Seller"), leaving a balance of
> $600,000.00 payable to Vendor/Seller.
>
> Notwithstanding such non-delivery of the Equipment, we
> hereby authorize and request you or your assignee to pay the
> sum of $300,000.00 to Vendor/Seller as soon as possible.  We
> further authorize you or your assignee to pay the sum of
> $150,000.00 to Vendor/Seller upon delivery of all of the
> Equipment, and a final payment of $150,000.00 upon
> installation and our complete acceptance of the Equipment.
>
> We agree that the Security Agreement shall commence on the
> date hereof and that our obligations hereunder, including

---

[2]Exhibit C has a telephone number at the top created by the fax transmission.  Mr.
Bath identified that telephone number as the fax number of his office.  Bath Deposition, at 54.

(without limitation) our obligation to make rental payments, shall not be affected in any respect whatsoever by the failure of Vendor/Seller to deliver and/or install any or all of the Equipment satisfactorily to us, and that we shall not assert any claim against you or your assignee as a result of this agreement.

We shall indemnify, defend and hold you and your assignee, jointly and severally, harmless from and against any and all losses, claims, suits, actions, liabilities, damages, costs and expenses (including attorneys' fees) arising directly or indirectly out of any claim by Vendor/Seller as a result of this agreement.  Vendor/Seller shall indemnify, defend and hold you and your assignee harmless from and against any and all losses, claims, suits, actions, liabilities, damages, costs and expenses (including attorneys' fees) arising directly or indirectly out of any claim by us for the cost of the Equipment or as a result of this agreement.

Except as modified herein, all of the terms of the Lease shall continue in full force and effect.  This agreement shall inure to the benefit of each of you and your respective successors and assigns.  By their execution, Vender/Seller agrees to all of the terms and conditions of this agreement.

Very truly yours,

CPA of New Jersey Inc.

By: s/ Charles Alario _____ vice president
       Signature       Title

          Agreed to:

          Infinia Builders, LLC

          By:s/ Thomas J. Bath _____ President
             Signature       Title

Motion, ex. C (emphasis in original).

On October 18, 2010, Monarch sent $300,000 by wire transfer to Infinia's account with Wachovia Bank.  Jenco Supplemental Declaration, ex. C.  It is also

5

undisputed that CPA provided $204,126 to Infinia. On receipt of these funds, Mr. Bath deposited them into the same Wachovia bank account. Bath Deposition, at 38.

Monarch avers and Mr. Bath does not deny that, before Monarch sent $300,000 to Infinia, Mr. Jenco spoke with him and confirmed that "he was the vendor of the restaurant equipment which was to be installed at the Golden Corral restaurant." Jenco Declaration, ¶ 6. Also not denied is that Mr. Bath sent to Mr. Jenco copies of the two equipment invoices mentioned above. Jenco Declaration, ¶ 8.[3] Mr. Bath further acknowledged that he understood that Monarch was providing "financing for the equipment," and that CPA was "leasing"[4] that equipment from Monarch. Bath Deposition, at 47. In addition, Mr. Bath admitted that he confirmed with Mr. Jenco "that I had received $204,000 that was to be used ultimately towards equipment purchase." Bath Deposition, at 57.

Monarch further avers but Mr. Bath does deny that Mr. Bath orally represented to Mr. Jenco that he was in possession of the equipment and would begin delivery to the Howell restaurant upon receipt of $300,000. Jenco Declaration, ¶ 7; Bath Declaration, ¶ 5; Bath Deposition, at 49.

There is no dispute that Infinia actually received and spent the $300,000 wire transfer from Monarch. Nor is there any dispute that Infinia also received $204,026 from CPA of New Jersey and spent those funds as well. Bath Declaration, ¶ 4. The latter

---

[3]The Jenco Declaration contains two paragraphs 8. The citation is to the second of the two paragraphs.

[4]For purposes of this motion, it is irrelevant whether the agreement between CPA and Monarch was an actual lease or a security agreement. The parties refer to the agreement as a lease.

were the only funds received by Infinia from CPA or Mr. Alario in connection with the

Howell restaurant project.  Bath Deposition, at 38.

There is also no dispute that Infinia did not order or purchase any

equipment for the Howell, New Jersey restaurant.  Instead, Mr. Bath, through Infinia,

swears that he used all the Monarch and CPA funds to pay the costs of engineering,

architectural drawings, site analysis, necessary permits and other development costs

associated with the construction of the Howell restaurant.  Bath Declaration, ¶ 8; Bath

Deposition, at 40-41, 57.  When asked the reason Infinia was paying development costs

for the Howell project, instead of CPA or Mr. Alario, Mr. Bath explained:

> Q. And can you explain to me why you were paying part of
> the engineer fees and why Mr. Alario was paying part of the
> engineer fees?
>
> A. Well, I was – we were – I was kind of doing a design/build
> turnkey.  And the financing was set up in such a way that in
> some instances I would pay the fees and in some instances he
> would.
>
> Again, it was one of those situations where I had a contract,
> and I was contracted to build the restaurant, but then there
> were additional costs, just like in just about any contract that's
> out there.
>                                  ***
> Q. Under your contract, there is no provision for you
> providing engineering services.
>
> A. Kind of– that's kind of a moot point.  In other words, the
> engineering services and the architectural fees and that were a
> part of the whole development cost, and I was paying for a
> portion of the development costs.

Bath Deposition, at 41-42.

Mr. Bath further acknowledged his understanding that Monarch intended to

provide a loan solely for the purchase of the restaurant equipment.  Bath Deposition, at

47. Nonetheless, Infinia used the Monarch funds for other purposes.  Mr. Bath again

explained under oath:

> Q. Did you get paid for the permit fees, engineering fees, and
> architectural fees that you advanced?
>
> A. No.  The only monies that I was paid for Howell were
> monies that I received as part of Monarch's payment to
> Infinia, and those monies were really the only thing that I had
> to apply to.
>
> Q. Did you use that money to reimburse yourself for the
> $50,000 that you had laid out for the –
>
> A. I wouldn't call it reimburse myself.  I used that money for
> permit fees, architectural fees, development costs; that was
> the monies that Mr. Alario was using as startup monies.
>
> Q. Did you understand that that money was designated solely
> for the purchase of equipment?
>
> A. The contract that – the long-term intention by Mr. Alario
> was that when the restaurant was built, he was going to then
> go ahead and refinance the restaurant, and he actually had a
> small business loan set up to take care of the whole turnkey
> project at the end.
>
> So I think his intention was to either continue to make the
> lease payments, or to pay off the lease, because I know that
> during that period of time, when the monies were disbursed,
> he paid a portion of -- he continued to pay a portion of that
> money back to Monarch or whoever Monarch's main entity –
> payment entity was.

Bath Deposition, at 45-46.

There is no dispute that the Howell, New Jersey restaurant was never built.

Jenco Declaration, ¶ 14; Bath Declaration, ¶ 10.

After signing its agreement with Monarch in October 2007, CPA made

monthly payments to Monarch through February 2008.  Jenco Declaration, ¶ 13.

8

Thereafter, it ceased tendering payments. Id. As of November 12, 2008, Monarch asserts

that CPA owes it $230,490.60.[5] Id.

On June 26, 2009, Mr. Bath filed a voluntary petition in bankruptcy under

chapter 7. In his bankruptcy schedules, Mr. Bath lists numerous unsecured debts on

Schedule F as "Infinia Business Debt" and does not list them as disputed, unliquidated or

contingent. Monarch is listed as an unsecured creditor on Mr. Bath's schedules holding a

"contingent" claim in the amount of $230,490.66.[6]

Monarch filed the above-captioned adversary proceeding on October 5,

2009, which was the last date set to file such a complaint under Fed. R. Bankr. P. 4004(a),

4007(c). See docket entry #8.

II.


A.


The purpose of summary judgment is to avoid the expense and delay of an

unnecessary trial because no material facts are in dispute and one of the parties is entitled

to prevail on the merits. See, e.g., Goodman v. Mead Johnson & Co., 534 F.2d 566, 573

---

[5] Paragraph 15 of the complaint avers that CPA owes Monarch $230,490.66.

[6] Mr. Bath's Statement of Financial Affairs lists numerous lawsuits pending against him during the 12 months prior to his bankruptcy filing. Some of those lawsuits also named Infinia as a defendant. Monarch is not identified as a plaintiff with a lawsuit against Mr. Bath. However, in Bankruptcy Schedule F, when he listed Monarch as holding a "contingent" claim against him, he also added: "Monarch Capital Corporation v. CPA of New Jersey, Inc., et al., Docket No.: L-9435-08." Thus, Monarch may have had pending litigation against CPA and other defendants, possibly Infinia and/or Mr. Bath, at the time of his bankruptcy filing.

(3d Cir. 1976), <u>cert.</u> <u>denied</u>, 429 U.S. 1038 (1977).  In general, the standard for entry of

summary judgment under Federal Rule of Civil Procedure 56, incorporated into

bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, is well

established.  As the Third Circuit Court of Appeals explained:

> Summary judgment is appropriate when the moving party is
> entitled to judgment as a matter of law and there is no genuine
> dispute of material fact. . . .  In order to defeat "a properly
> supported summary judgment motion, the party opposing it
> must present sufficient evidence for a reasonable jury to find
> in its favor." <u>Groman v. Township of Manalapan</u>, 47 F.3d
> 628, 633 (3d Cir. 1995) (citing <u>Anderson v. Liberty Lobby,</u>
> <u>Inc.</u>, 477 U.S. 242, 250-52, 106 S. Ct. 2505, 2511-12, 91 L.
> Ed. 2d 202 (1986)).  In essence, the non-moving party must
> demonstrate a dispute over facts that might affect the outcome
> of the suit.  <u>Id.</u>  Moreover, in reviewing the record, we must
> give the non-moving party the benefit of all reasonable
> inferences. . . .

<u>Hampton v. Borough of Tinton Falls Police Dept.</u>, 98 F.3d 107, 112 (3d Cir. 1996).

The application of these general principles is affected by the allocation of

the evidentiary burden of persuasion were the dispute to proceed to trial.  That is, a trial

court's approach to summary judgment is dependent upon whether the party seeking

summary judgment would have the burden of persuasion at trial.  <u>See</u> <u>generally</u> 11

<u>Moore's Federal Practice 3d</u>, §§ 56.03[4], 56.13[3] (2006).  This approach was well

summarized in <u>Adams v. Consolidated Rail Corp.</u>, 1994 WL 383633, at *1-*2 (E.D. Pa.

1994) (citations omitted):

> The Supreme Court articulated the allocation of burdens
> between a moving and nonmoving party in a motion for
> summary judgment in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317
> (1986).  The Court held that where the movant is the
> defendant, or the party without the burden of proof on the
> underlying claim, the movant still has the initial burden of
> showing the court the absence of a genuine issue of material
> fact, but that this does not require the movant to support the

motion with affidavits or other materials that negated the opponent's claim. Id. at 323. In contrast, where, as here, "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank [of New York], 979 F.2d 1579, 1582 (3d Cir. 1992). To sustain its initial burden under such circumstances, the movant must:

> "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). . . . If the movant makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact. . . .

Accord In re White, 243 B.R. 498, 501 n.4 (Bankr. N.D. Ala. 1999).

As Monarch has the burden to demonstrate its entitlement to relief under section 523(a)(2), it must present affirmative evidence in support of the present motion.

B.

As mentioned earlier, Monarch only seeks summary judgment as to Count I of its complaint. In Count I, Monarch contends that its claim against Mr. Bath falls within the scope of 11 U.S.C. § 523(a)(2)(A), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
> ***

11

> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by–
>
>> (A) false pretenses, a false representation, or
>> actual fraud, other than a statement respecting
>> the debtor's or an insider's financial condition[.]

In parsing the language of section 523(a)(2)(A), courts have drawn a

distinction between a "false representation" and "false pretenses":

> The "false representation" ground requires a showing that the
> debtor made a "false or misleading statement about
> something." [In re Barnaby, 2007 WL 750332,] at *2
> [(Bankr. D.N.J. 2007)].  The second option, "false pretenses,"
> requires proof of an implied misrepresentation promoted
> knowingly and willingly that creates a misleading
> understanding of the transaction by the plaintiff.  Id. at *2
> (citation omitted).  See [In re Ali, 321 B.R. 685,] at 690
> [(Bankr. W.D. Pa. 2005)] (false pretense involves an implied
> misrepresentation, as distinguished from an express
> misrepresentation, that creates or fosters a false impression).

In re Giquinto, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008); see, e.g., In re Brandon,

297 B.R. 308, 313 (Bankr. S.D. Ga. 2002); Matter of Haining, 119 B.R. 460, 463-64

(Bankr. D. Del. 1990); In re Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983).

> As observed by another bankruptcy court:

> "False pretense do[es] not necessarily require overt
> misrepresentations.  Instead, omissions or a failure to disclose
> on the part of the debtor can constitute misrepresentations for
> purposes of nondischargeability where circumstances of the
> case are such that omissions or failure to disclose create a
> false impression which is known by the debtor." Peterson v.
> Bozzano (In re Bozzano), 173 B.R. 990, 993 (Bankr.
> M.D.N.C. 1994). . . .  Failure to disclose material facts on
> which a transaction depends constitutes false pretenses within
> the statute.

In re Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996).

12

In order for a plaintiff to prevail under the false representation provision of

section 523(a)(2)(A) it must demonstrate that:

> (1) the debtor made the representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made. See, e.g., Field v. Mans, 516 U.S. 59, 61, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995); In re Ophaug, 827 F.2d 340, 342 n. 1 (8th Cir. 1987); In re Maurer, 112 B.R. 710, 712-13 (Bankr. E.D. Pa. 1990).

In re Antonious, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006); see In re Hilley, 124 Fed.

Appx. 81, 82 (3d Cir. 2005) (non-precedential).

The elements of establishing a nondischargeable claim for false pretenses

are similar:

> In order to establish that a debt is nondischargeable under § 523(a)(2)(A) as a debt for money, property, services, or credit obtained by false pretenses, a plaintiff must prove by a preponderance of the evidence that: "(1) the [defendant] made an omission or implied misrepresentation; (2) promoted knowingly and willingly by the defendant[ ]; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff [ ]; (4) which wrongfully induced the plaintiff[ ] to advance money, property, or credit to the defendant."

In re Khafaga, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (quoting In re Hambley, 329

B.R. 382, 396 (Bankr. E.D.N.Y. 2005)).

Whether asserting that false pretenses or a false representation were made

and warrant relief under section 523(a)(2)(A), a showing of justifiable reliance and

causation of loss must be made. See, e.g., In re Antonious, 358 B.R. at 182; In re Ali,

321 B.R. 685, 690 (Bankr. W.D. Pa. 2005). Moreover, when seeking a determination

under section 523(a)(2), the plaintiff bears the burden of proving nondischargeability by a preponderence of the evidence. In re Graham, 973 F.2d 1089, 1101 (3d Cir. 1992) (citing Grogan v. Garner, 498 U.S. 279, 288 (1991)). And when evaluating whether a debtor intended to deceive a creditor by his misrepresentations or false pretentions, a court must look at the debtor's intention, Field v. Mans, 516 U.S. at 59, at the time the misrepresentation, either express or implied, was made. Matter of Jadusingh, 2001 WL 360701, at *2 (E.D. Pa. 2001). Such intent may be established by circumstantial evidence. In re Giquinto, 388 B.R. at 166.

## III.

A preliminary issue must be considered before I can determine whether Monarch is entitled to summary judgment on Count I. Monarch was lending money to CPA and expected to be repaid by that entity, and indeed did receive some payments and, if the debtor's bankruptcy schedules are accurate, asserts in a pending lawsuit that it holds a claim against CPA. In determining this summary judgment motion, I must consider whether Monarch is also a creditor of Mr. Bath.

There is no dispute that Monarch transferred money to Infinia for purposes of section 523(a)(2). Section 523(a) provides that certain "debts" are not dischargeable. A debt is defined in section 101(12) as a "liability on a claim." A "creditor" is an entity that has a claim against the debtor. 11 U.S.C. § 101(10). And a claim means "a right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent,

14

matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11

U.S.C. § 101(5)(A).

> Accordingly, every dischargeability proceeding involves two
> separate inquiries. First, does the creditor hold an enforceable
> obligation under non-bankruptcy law. Second, is the debt
> non-dischargeable under bankruptcy law, specifically §
> 523(a). . . . In the absence of an enforceable obligation, there
> is no "debt" that can be non-dischargeable.

In re Roland, 294 B.R. 244, 249 (Bankr. S.D.N.Y. 2003) (citations omitted); see, e.g., In

re McKendry, 40 F.3d 331, 337 (10th Cir. 1994). If Monarch is not a creditor of the

debtor, then it cannot prevail under section 523(a)(2)(A).

In order to be classified as a creditor of Mr. Bath, Monarch must be able to

assert a right to payment from him, even if such an assertion may be disputed by the

debtor. See In re Abijoe Realty Corp., 943 F.2d 121, 125 (1st Cir. 1991). Indeed,

Congress chose the "broadest possible definition" of the term "claim." See In re

Grossman's Inc., 607 F.3d 114, 121 (3d Cir. 2010) (citing H.R. Rep. No. 95-595 at 309

(1977)). Thus, Monarch will be considered a creditor, and therefore entitled to seek relief

under section 523(a), unless its claim against Mr. Bath is "facially meritless." See In re

Abijoe Realty Corp., 943 F.2d at 125.

A.


Whether an entity holds a claim against the debtor is generally determined

by relevant non-bankruptcy law, typically state law.

> This reading of § 502(b)(1) is consistent not only with the
> plain statutory text, but also with the settled principle that
> "[c]reditors' entitlements in bankruptcy arise in the first
> instance from the underlying substantive law creating the
> debtor's obligation, subject to any qualifying or contrary

provisions of the Bankruptcy Code." <u>Raleigh v. Illinois Dept.</u>
<u>of Revenue</u>, 530 U.S. 15, 20 . . . (2000). That principle
requires bankruptcy courts to consult state law in determining
the validity of most claims. See <u>ibid</u>.

Indeed, we have long recognized that the "'basic federal rule'
in bankruptcy is that state law governs the substance of
claims, Congress having 'generally left the determination of
property rights in the assets of a bankrupt's estate to state
law.'" <u>Ibid</u>.

<u>Travelers Casualty and Surety Co. of America v. Pacific Gas and Elec. Co.</u>, 549 U.S. 443,

450-51 (2007) (citations omitted); <u>see</u>, e.g., <u>Vanston Bondholders Protective Committee</u>

<u>v. Green</u>, 329 U.S. 156, 161 (1946) ("What claims of creditors are valid and subsisting

obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question

which, in the absence of overruling federal law, is to be determined by reference to state

law.").

Monarch and CPA were both entities based in New Jersey. Infinia and Mr.

Bath are located in Pennsylvania. The equipment loan involved a restaurant that was to

be located in New Jersey and the equipment was to be installed in New Jersey. Thus, in

determining whether Monarch holds a claim against Mr. Bath, only New Jersey or

Pennsylvania state law could be germane.

In determining which state law is relevant, I must first consider federal

common law choice of law principles. When bankruptcy litigation involves a dispute

arising from federal substantive law, such as 11 U.S.C. § 523(a), federal common law

principles typically will govern. See generally <u>Gluck v. Unisys Corp.</u>, 960 F.2d 1168,

1179 n.8 (3d Cir. 1992) (holding that federal common law governs disputes involving

ERISA). Thus, in decisions involving objections to discharge and nondischargeability,

courts have applied federal common law rather than the forum state's choice of law

16

approach to determine relevant state law. See, e.g., Matter of Crist, 632 F.2d 1226, 1229

(5th Cir. 1980), cert. denied, 451 U.S. 986 (1981); In re Segretario, 258 B.R. 541, 544-45

(Bankr. D. Conn. 2001). This is appropriate because the underlying adversary proceeding

involves either the debtor's right to a bankruptcy discharge or the scope of that discharge,

both of which involve important federal interests. See generally Local Loan Co. v. Hunt,

292 U.S. 234, 244 (1934) (citations omitted):

> One of the primary purposes of the Bankruptcy Act is to
> "relieve the honest debtor from the weight of oppressive
> indebtedness, and permit him to start afresh free from the
> obligations and responsibilities consequent upon business
> misfortunes." Williams v. U.S. Fidelity & Guaranty Co., 236
> U.S. 549, 554, 555 . . . [1945]. This purpose of the act has
> been again and again emphasized by the courts as being of
> public as well as private interest, in that it gives to the honest
> but unfortunate debtor who surrenders for distribution the
> property which he owns at the time of bankruptcy, a new
> opportunity in life and a clear field for future effort,
> unhampered by the pressure and discouragement of
> pre-existing debt.

For example, in Vanston Bondholders Protective Committee v. Green,

where the validity of a proof of claim in a bankruptcy case was at issue, the Court relied

upon federal conflicts of law principles to determine the validity of the claim. 329 U.S. at

162. See also In re Lindsay, 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases

with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply

federal, not forum state, choice of law rules."), cert. denied sub nom. Lindsay v.

Beneficial Reinsurance Co., 516 U.S. 1074 (1996).

In general, "federal choice of law rules apply the law of the jurisdiction

with the most significant relationship with the action." In re Gaston & Snow, 243 F.3d

599, 605 (2d Cir. 2000), cert. denied sub nom. Erkins v. Bianco, 534 U.S. 1042 (2001);

17

see also In re Olsen Industries, Inc., 2000 WL 376398, at *11 (D. Del. 2000).  New

Jersey, which is the site of the intended restaurant and equipment, as well as the location

of Monarch and CPA, has a more significant relationship to the question whether

Monarch holds a claim against Mr. Bath than does Pennsylvania.  Therefore, I shall

consider New Jersey law to determine whether Monarch holds a claim against Mr. Bath,

in the broad sense of the definition established by section 101(5) of the Bankruptcy Code.


B.


As mentioned above, Monarch transferred $300,000 to Infinia as a partial

loan payment on behalf of CPA towards the purchase of equipment for the Howell, New

Jersey restaurant.  The payment was denoted as a "deposit" and Infinia was identified as

the vendor/seller of the equipment.

> In New Jersey, the tort of conversion is defined as:
>
> > an unauthorized assumption and exercise of the right of
> > ownership over goods or personal chattels belonging to
> > another, to the alteration of their condition or the exclusion of
> > an owner's rights.

LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div.), certif. denied, 199 N.J. 133

(2009).  See, e.g., Charles Bloom & Co. v. Echo Jewelers, 279 N.J. Super. 372, 381 (App.

Div. 1995).  Moreover,

> > [t]he crux of conversion is wrongful exercise of dominion or
> > control over property of another without authorization and to
> > the exclusion of the owner's rights in that property. . . .
> > Conversion does not require that defendant have an intent to
> > harm the rightful owner, or know that the money belongs to
> > another.

18

Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 456 (App. Div. 2009); see, e.g., Four

Pals, LLC v. Javamoon Café Franchise Services, LLC, 2010 WL 3185221, at *4-*5 (N.J.

Super. App. Div. 2010).

Even if the funds transferred to Infinia were intended as loan proceeds,

under New Jersey law loan proceeds obtained via fraud or false pretenses are still

considered the property of the lender and subject to the tort of conversion.  See Chicago

Title Ins. Co. v. Ellis, 409 N.J. Super. at 455.

In this proceeding, Mr. Bath swore in his deposition (quoted above) that

CPA and Mr. Alario—although representing to Monarch that the borrowed funds would

be deposited with Infinia to purchase equipment upon which Monarch would hold a

security interest—intended to use the loan funds for development costs, and then repay

Monarch with subsequent loan refinancing proceeds.  Infinia, knowing both Monarch's

intentions and contractual rights, as well as CPA's intentions, then dispersed the Monarch

funds in a manner different from that which Monarch was informed when the lender

made the equipment loan deposit.  Accordingly, Monarch has at least a disputed claim

that it retained ownership of the loan funds, and that Infinia is liable to it for conversion

under New Jersey law.  See Chicago Title Ins. Co. v. Ellis; see also Rhino Fund, LLLP v.

Hutchins, 215 P.3d 1186, 1195-96 (Colo. App. 2008).

Alternatively, Infinia may be liable to Monarch for conversion if considered

a bailee of Monarch's funds.  Recently, a New Jersey appellate court explained the

common law concept of bailment in these terms:

> A bailment is created by the delivery of personal property by
> one person to another in trust for a specific purpose, pursuant
> to an express or implied contract to fulfill that trust.  Inherent
> in the bailment relationship is the requirement that the

19

> property be returned to the bailor, or duly accounted for by the
> bailee, when the purpose of the bailment is accomplished, or
> that it be kept until it is reclaimed by the bailor.

LaPlace v. Briere, 404 N.J. Super. at 598 (quoting 8A AMJUR Bailments § 1 (2d ed.

1997)).  A bankruptcy treatise has offered a similar definition of bailment in the context

of discussing the scope of section 541(a):

> A bailment is nothing more than a delivery of goods for some
> purpose, upon a contract, express or implied, to be redelivered
> to the bailor upon fulfillment of the purpose or to be dealt
> with according to the bailor's direction.  A bailment
> relationship may exist in many diverse forms.  For example,
> goods might be delivered to the bailee upon the understanding
> that those goods might then be sold to a third party, with
> either the sale proceeds or any unsold goods subsequently
> delivered back to the bailor.

5 Collier on Bankruptcy, ¶ 541.05[1][a] (16th ed. 2010).

As any type of personal property can be the subject of a bailment, CJS

Bailments § 19 (2010), courts have concluded that money may also be the subject of a

bailment.  In re Computrex, Inc., 403 F.3d 807, 812 (6th Cir. 2005):

> The Payment Agreement indicates that the funds the Debtor
> received were to be passed on to pay its clients' carriers.  The
> Debtor here is in essentially the same position as a bailee:
> Contech (the bailor) directed the Debtor (the bailee) to take
> possession of Contech's money and subsequently disburse it
> to Contech's creditors.

See, e.g., Kula v. Karat, Inc., 531 P.2d 1353, 1354 (Nev. 1975) ("A bailment of money is

as well recognized as the bailment of any other personal property."); Hargis v. Spencer,

71 S.W.2d 666, 668 (Ky. Ct. App. 1934) ("[I]t is admitted by the evidence that there was

here a bailment by appellant of his bag of gold money to bailee, made for his benefit and

upon his request that she take and keep it for him—without compensation therefor—until

he should call for its return[.]").

20

When the bailee fails to return the property subject to bailment, or fails to use such property in the manner intended by the bailor, the bailee may be liable to the bailor under New Jersey law for conversion. <u>Lembaga Enterprises, Inc. v. Cace Trucking & Warehouse, Inc.</u>, 727 A.2d 1026, 1029 (N.J. Super. 1999) (citations omitted).

Based upon the undisputed facts set out above, Infinia obtained funds from Monarch, under the terms of the October 11th letter agreement, which provided such funds with the intention of placing with Infinia a deposit toward the purchase of restaurant equipment to be installed in a Golden Corral restaurant in Howell, New Jersey, owned by CPA. By failing to use that deposit for its intended purpose, New Jersey law may establish that Infinia was a bailee and that Monarch holds a claim against Infinia for conversion.

Monarch also holds at least a disputed claim against Infinia for tortious interference with the contract between Monarch and CPA. As defined under New Jersey law:

> To establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage. . . .
>
> Interference with a contract is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." <u>Restatement (Second) Torts</u>, § 766A, comment e (1977). "An individual acts with malice when he or she intentionally commits a wrong without excuse or justification." <u>Cox v. Simon</u>, 278 N.J. Super. 419, 433, 651 A.2d 476 (App. Div.1995). However, the fact that a breaching party acted "to advance [its] own interest and financial position" does not establish the necessary malice or wrongful conduct. <u>Sandler v. Lawn-A-Mat Chem. & Equip. Corp.</u>, 141 N.J. Super. 437,

> 451-452, 358 A.2d 805 (App. Div.), <u>certif. denied</u>, 71 N.J.
> 503, 366 A.2d 658 (1976).  A claim for tortious interference
> with the performance of a contract must be based, in part, on
> facts claiming that the interference was done intentionally and
> with 'malice.' . . . For purposes of this tort, '[t]he term malice
> is not used in the literal sense requiring ill will toward
> plaintiff.' . . . Rather, malice is defined to mean that the harm
> was inflicted intentionally and without justification or excuse.
> <u>Printing Mart</u>, <u>supra</u> (116 N.J. at 751, 563 A.2d 31) (citations
> omitted).

<u>Dello Russo v. Nagel</u>, 358 N.J. Super. 254, 268-269 (App. Div. 2003) (citations omitted).

<u>See</u>, <u>e.g.</u>, <u>214 Corp. v. Casino Reinvestment Development Authority</u>, 280 N.J. Super. 624,

628 (N.J. Super. Law 1994).

  Infinia's intentional failure to use the deposited loan funds to purchase

equipment upon which Monarch would have a contractual security interest arguably

meets all four elements of this tort under New Jersey law.

  Finally, to the extent that Monarch holds a claim against Infinia for the tort

of conversion or for tortious interference with contractual relations, under New Jersey

state law Monarch also holds a claim against the debtor, Mr. Bath.  As president of

Infinia, and possibly its sole full-time employee, it was Mr. Bath who knowingly directed

Infinia's use of the funds provided by Monarch for purposes other than those intended by

Monarch.  As stated by a New Jersey appellate court:

> Any corporate officer, or director who participates by aid,
> instigation, or assistance in a conversion, is liable. . . .  A
> director or officer of a corporation does not incur personal
> liability for its torts merely by reason of his official character,
> but, a director or officer who commits a tort, or who directs
> the tortious act to be done, or participates or cooperates
> therein, is liable to third persons injured thereby, even though
> liability may also attach to the corporation for the tort.
> . . . . Corporate officers are liable to persons injured by their
> own torts, even though they were acting on behalf of the
> corporation and their intent was to benefit the corporation.

22

Charles Bloom & Co. v. Echo Jewelers, 652 A.2d at 1243 (citations omitted); see In re

B.S. Livingston & Co., Inc., 186 B.R. 841, 866 (D.N.J. 1995); see also Rhino Fun LLLP

v. Hutchins, 215 P.3d 1186 (Col. App. 2008).

Thus, to the extent Infinia improperly used Monarch's funds deposited with

it, it did so by acting through Mr. Bath.  In so doing, Mr. Bath is not insulated by Infinia's

limited liability company status.  See also D.R. Horton Inc. - New Jersey v. Dynastar

Development, L.L.C., 2005 WL 1939778, at *38  (N.J. Super. Law Div. 2005) (manager

of limited liability company held personally liable for tortious conduct of the company);

Reliance Ins. Co. v. The Lott Group, Inc., 370 N.J. Super. 563 (App. Div. 2004)

(individual corporate officer personally liable for corporate misuse of deposited funds).

Accordingly, I conclude that Monarch is a creditor of Mr. Bath and may

seek to have its claim determined as nondischargable under section 523(a).  In so doing, I

need not and do not find that Mr. Bath would have no defenses to Monarch's claims

against him.  I only conclude that Monarch holds a claim in the broad sense defined in the

Bankruptcy Code and thus is a creditor of the debtor.[7]

IV.

In its complaint, Monarch contends that Mr. Bath expressly and falsely

represented to Mr. Jenco that Infinia was already in possession of the equipment

---

[7]Indeed, as noted above, Mr. Bath appears to have reached the same conclusion, for he has scheduled Monarch as an unsecured creditor.  The reference in his bankruptcy schedules to Monarch's holding a "contingent" claim may constitute his belief that he will be liable to Monarch to the extent that the lender cannot recover from CPA.

purchased for the Howell restaurant, prior to Monarch's transferring $300,000 to Infinia. Complaint, ¶ 10. The debtor denies ever so representing that he had possession of the restaurant equipment, both in his answer and in his declaration opposing summary judgment. Bath Declaration, ¶ 5. Thus, whether Mr. Bath made a "false representation" within the meaning of section 523(a)(2)(A) cannot be determined in the context of summary judgment, as material facts are in dispute.

Recognizing this, Monarch asserts in seeking summary judgment that the undisputed facts demonstrate that it paid $300,000 to Infinia under the false pretense that these funds would be held by Infinia solely as a partial payment for the future purchase of equipment upon which Monarch would hold a security interest. Motion for Summary Judgment, at 2. For the following reasons, I agree that Monarch has met its burden that its claim against Mr. Bath arose from false pretenses.

As noted earlier, it is undisputed that Infinia was authorized by CPA to purchase and install equipment for its Howell, New Jersey, Golden Corral restaurant. As such, Infinia was categorized as "vendor" of the equipment. Infinia then established a price for equipment installation and purchase at $804,126. CPA placed a deposit with Infinia of $204,126 toward the purchase of this equipment: approximately 25% of the total cost. Although Monarch had been so informed previously, these facts were confirmed in writing by a letter faxed to its office by Infinia on October 11, 2007.

It is also undisputed that Monarch agreed to loan CPA the $600,000 balance in return for a security interest on the equipment. CPA then requested by this October 11th letter that Monarch transfer the loan funds to Infinia in three installments: $300,000 "as soon as possible"; $150,000 on delivery of the equipment; and $150,000 upon

24

installation and acceptance of the equipment by CPA. Again, Infinia was aware of these facts having "agreed to" them in the October 11th letter it sent to Monarch. Moreover, Infinia had previously provided to Monarch copies of the invoices detailing the equipment to be purchased on behalf of Infinia, including the total cost.

Thus, the undisputed evidence is clear that Monarch was loaning funds to CPA solely for the purchase of restaurant equipment, which Infinia knew, and was providing loan funds to Infinia solely in the latter's capacity of "Vendor/Seller" of this equipment, of which Infinia and Mr. Bath also were aware. Not only does the October 11th letter make this clear, but Mr. Bath admits this:

> Q. You understand that with regard to Howell that Monarch
> was providing financing for the equipment.
>
> A. Yes.

Bath Deposition, at 47.

Monarch though was unwilling to lend the entire cost of the equipment plus installation. It agreed to lend only about 75% of the total cost, with CPA depositing the other 25% with Infinia. Moreover, Monarch did not transfer any funds to Infinia until Infinia had confirmed that it held CPA's 25% deposit. Therefore, the inference is apparent: Monarch agreed to loan funds to CPA and risk not being repaid by that borrower, but intended to reduce its risk by taking a security interest in the equipment and having CPA pay about 25% of its value.

All of this had to have been obvious to Infinia and Mr. Bath. It must also have been clear to both that Monarch was transferring funds to Infinia with the understanding that Infinia would use the funds solely for the purchase of all of the equipment identified in the September 2007 invoice. The amount loaned was precisely

25

the balance needed to purchase the invoiced equipment after the deposit payment by CPA, according to Infinia's own invoice. The October 11th letter further correlated the Monarch loan with the equipment.

Nonetheless, Infinia, through Mr. Bath, decided to use the funds deposited by Monarch and CPA to finance the start-up costs of the construction of the restaurant, rather than retain them as deposits for the purchase of equipment. Mr. Bath states that CPA, through Mr. Alario, agreed to such use of CPA funds. He does not assert that Monarch also authorized Infinia to use its loan funds for site development. That is, Mr. Bath does not dispute that Monarch never agreed to provide funding for development costs associated with the Howell restaurant project, nor to run the risk that such project would never be built.

Moreover, Mr. Bath acknowledged that Infinia had no intention to use the Monarch funds to order restaurant equipment when he received those funds in October 2007. This intention was not disclosed to Monarch, even though CPA requested in the October 11th letter that Monarch transfer $300,000 to Infinia, the equipment vendor, "as soon as possible," and Infinia knew of this request and that the lender had so complied.

First, it is undisputed that, in October 2007, no construction on the Howell restaurant project had begun. Second, the funds received by Infinia from CPA and Monarch toward the purchase of equipment were deposited into Infinia's general account with Wachovia Bank. No segregated account was established. Bath Deposition, at 85. Third, copies of emails submitted by Mr. Bath in opposition to summary judgment demonstrate that shortly before Infinia received Monarch's wire transfer of $300,000, Mr. Bath intended to use the equipment funds for development of the site. See Bath

26

Opposition, ex. B (email dated 10/16/2007 from Thomas Bath to Richard DiFolco: "Rich,

check coming your way today. When do you think we could start sitework. I need to get

moving on this before winter."; email dated 11/16/2007 from DiFolco to Bath: "We just

received a phone call today from Howell Planning Board. . . . (The check sent last month

was apparently used to pay bills in arrears and not for current work. . . .")).

Fourth, it was his normal practice not to order equipment for restaurants

under construction until the building was almost or fully completed. See Bath

Deposition, at 33 (he would wait until the building is 70% completed); Bath Declaration,

¶ 6:

> It was my normal practice with Charles Alario and/or CPA
> and other entities that Charles Alario was the principal of to
> purchase restaurant equipment after completion of the
> restaurant building.

And fifth, Mr. Bath stated in his deposition that it was CPA's intention that

the Monarch funds be used for development purposes, with repayment of the loan to be

made from future refinancing. Bath Deposition, at 45-46.

If Infinia did not intend to order equipment until the Howell restaurant

building had been constructed, or was 70% completed, there was no need to request that

Monarch transfer $300,000 to Infinia in October 2007, when construction had not even

started, unless those funds were intended for another purpose: i.e., development. See In

re Eccles, 393 B.R. 845, 852 (Bankr. E.D. Mo. 2008) (circumstantial evidence

demonstrated debtors' intent to deceive lender through false pretenses).

Indeed, Mr. Bath stated at his deposition that he did not consider the CPA

funds as an equipment deposit:

27

> Q. And why did Mr. Alario or his company give you a deposit
> for the equipment if the equipment, you didn't need it for
> months?
>
> A. Well, really [it] was a deposit for the project, and that's
> where the confusion comes in.

Bath Deposition, at 40. Thus, Infinia and Mr. Bath allowed Monarch to believe that CPA

had deposited funds for equipment purchase, and that Monarch was also depositing

$300,000 with Infinia solely to be used for the purchase of restaurant equipment, even

though Infinia intended to use the funds towards construction of the "project."

Accordingly, Monarch holds a claim against Mr. Bath under state law for

money transferred to his company solely for the purchase of restaurant equipment that

would serve as collateral for Monarch, and which funds were intentionally used for

another purpose. Moreover, Monarch provided such funds under the false

pretenses—i.e., falsely implied representations—that Infinia would hold the loan funds

and use them solely for their intended purpose, that Infinia held a CPA deposit which was

also to be used solely to purchase equipment, and that the equipment would serve as

collateral for the Monarch loan. That Mr. Bath, as he claims in his declaration, had every

intention of building the Howell restaurant and installing equipment therein does not

undermine the conclusion that he obtained funds from Monarch under false pretenses.

In addition, as a result of these false pretenses, upon which Monarch

justifiably relied,[8] see generally, Field v. Mans, 516 U.S. 59 (1995), Monarch has suffered

_____

[8]Mr. Bath briefly argues that Monarch was not justified in relying upon the
explicit and implicit representations found in the October 11, 2007 letter, because it never sought
to inspect the Howell project or determine whether the restaurant equipment existed until 2008,
after CPA defaulted in payments. Debtor's Opposition to Summary Judgment at 5
(unpaginated). Of course, the argument overlooks the debtor's factual contention that he never

(continued...)

28

monetary loss. It would not have forwarded funds to Infinia had it known that Infinia

would not restrict its use to the purchase of restaurant equipment for the Howell

restaurant. Moreover, as the Monarch money has been spent by Infinia and has not been

recovered from CPA, it has suffered damages.

Therefore, based upon the undisputed material facts, its claim against Mr.

Bath is nondischargeable under section 523(a)(2)(A). See In re Eccles, 393 B.R. at 851-

---

[8](...continued)
told Mr. Jenco at Monarch that the equipment was in his possession. If so, one cannot fault
Monarch for failing to inspect non-existent equipment.
        Moreover, the debtor's argument overlooks both the definition of "justifiable
reliance" as well as the point of time at which it is evaluated. As to the latter, the relevant time is
October 18, 2007, when the debtor here received $300,000 from Monarch:

> For purposes of Section 523(a)(2), however, the timing of the fraud
> and the elements to prove fraud focus on the time when the lender,
> Pro Source, made the extension of credit to the Debtor. In other
> words, Bombardier as assignee of the Agreement, steps into the
> shoes of its assignor Pro Source, and the inquiry of whether a
> creditor justifiably relied on Debtor's alleged misrepresentations is
> focused on the moment in time when that creditor extended the
> funds to Debtor.

In re Dobek, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002); see In re Boyajian, 367 B.R. 138, 147
(B.A.P. 9th Cir. 2007).
        As to the former, justifiable reliance "is an intermediate level of reliance, falling
somewhere between the more stringent 'reasonable reliance' guidepost and the lenient 'reliance
in fact.' . . . In application, this standard does not impose a duty to investigate unless the falsity
of the representation is easily detectable." In re Dobek, 278 B.R. at 508 (quoting Field v. Mans).
"In contrast to the reasonable reliance standard, in order to show justifiable reliance, the creditor
need not prove that he acted consistent with ordinary prudence and care." Sanford Institution for
Sav. v. Gallo, 156 F.3d 71, 74 (1st Cir. 1998).
        Here, Monarch took steps to mitigate its risk of not being repaid by CPA.
Moreover, it received written assurances from Infinia, through Mr. Bath, that the CPA deposit
had been received, and that Infinia understood that Monarch was to have a security interest in the
equipment. Monarch also obtained an itemization of the equipment to have been purchased as
well as verification of the cost from the "vendor/seller": i.e., Infinia. Monarch had no reason to
suspect that the vendor/seller of the equipment intended to use transferred funds for start-up
development costs. Thus, its reliance upon Infinia was justified. See, e.g., In re Moore, 365 B.R.
at 604-05.

54 (loan provided on the implicit representation that the proceeds would be used solely to renovate property, but proceeds were actually used to pay the debtors' personal expenses, was nondischargeable as obtained under false pretenses); In re Moore, 365 B.R. 589 (Bankr. D. Md. 2007), aff'd, sub nom. Ultra Litho PYT, Ltd. v. Moore, 347 Fed. Appx. 971 (4th Cir. 2009); In re Wimbish, 95 B.R. 379 (Bankr. W.D. Pa. 1989); In re Mistry, 77 B.R. 507 (Bankr. E.D. 1987) (debt held nondischargeable where plaintiff loaned funds to the debtor based upon misrepresentations regarding the use of the loan proceeds).

V.

Finally, although not specified in its complaint, at the end of its memorandum in support of summary judgment as to Count I, Monarch requests that judgment be entered in its favor in the amount of $230,490.60—the amount that it asserts in paragraph 15 of its complaint that is still owing by CPA. In support thereof, Mr. Jenco's declaration states: "CPA made payments for several months, but defaulted and failed to make any payments since February 2008. As of November 12, 2008, there is due from CPA the sum of $230,490.60." Jenco Declaration, ¶ 13.

The debtor's answer to the complaint denies the averment, stating that he is without information as to these facts. His declaration and opposition to summary judgment do not address this issue in any way. That is, he offers no evidence to challenge Monarch's averment that it has been repaid only $69,509.40 of the $300,000.00 transferred to Infinia on behalf of CPA.

30

The liability that Mr. Bath has to Monarch under New Jersey law may be measured as damages in the amount of $300,000 less payments received from CPA. See generally Reliance Ins. Co. v. The Lott Group, Inc., 370 N.J. Super. 563 (2004). Furthermore, although this chapter 7 case has been classified as a no-asset bankruptcy case, and thus creditors were not required to file any proofs of claim, a bankruptcy court does have the power to enter judgment on a claim, see In re Porges, 44 F.3d 159 (2d Cir. 1995), and may do so in nondischargeability litigation when appropriate. See, e.g., In re Morrison, 555 F.3d 473, 478-80 (5th Cir. 2009); In re Kennedy, 108 F.3d 1015, 1017-18 (9th Cir. 1997); In re McLaren, 3 F.3d 958, 965-66 (6th Cir. 1993); Matter of Hallahan, 936 F.2d 1496, 1507-08 (7th Cir. 1991); see also In re Buckley, 2009 WL 400628, at *3 (Bankr. C.D. Ill. 2009) ("A bankruptcy court has the jurisdiction to enter a money judgment for a claim found to be excepted from discharge. . . . But that jurisdiction is exercised in the court's discretion and the court may opt to simply determine that a debt is nondischargeable without determining or entering a money judgment in a specific amount.") (citation omitted).

Here, I conclude that the better exercise of discretion is to decline fixing the amount of Monarch's state law claim against Mr. Bath.

As noted earlier, according to the debtor's bankruptcy schedules, there may be pending state court litigation involving Monarch and CPA. That litigation has other defendants, possibly Infinia, Mr. Bath and/or Mr. Alario. Although there are sufficient undisputed facts to determine that Infinia and Mr. Bath are liable to Monarch, those facts were applied to the broad definition of a "claim" under the Bankruptcy Code, discussed earlier. It would be inappropriate in the context of determining nondischargeability under

31

Count I to conclude that Mr. Bath has no defenses to his liability under state law. For

example, there is only Mr. Bath's statements as to the role if any, played by CPA and Mr.

Alario in connection with Infinia's use of the equipment deposit funds to pay site

development costs regarding the Howell, New Jersey restaurant project. Neither CPA nor

Mr. Alario are parties in this proceeding.

 Therefore, I cannot determine whether the obligation owed to Monarch is

joint, or whether Mr. Bath holds any claims against CPA and Mr. Alario that should or

must be adjudicated along with Monarch's claim. See generally Refrigeration Discount

Corp. v. Catino, 330 Mass. 230, 235 (1953) ("All parties engaged in committing a

conversion of the goods of another may be held jointly and severally liable for the

wrong.").

 Accordingly, in this instance it is more appropriate to leave to the state

court the determination of any monetary judgment against Mr. Bath. See In re Chan,

2008 WL 5428271, at *21-22 (Bankr. E.D. Pa. 2008) (if a bankruptcy court has the

power to enter judgment against a debtor in dischargeability litigation, it is inappropriate

to exercise such power when the entire controversy is not before the bankruptcy court).

 An order will be entered consistent with this memorandum that determines

that the claim held by Monarch against Mr. Bath is nondischargeable under section

523(a)(2)(A). That determination renders moot Monarch's claim under Count II. The

objection to discharge claim under section 727(a), Count III, is not moot and will be

scheduled for trial.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: October 19, 2010

32